## BRYAN & COLLEGE INTERURBAN RY. CO. v. ELLISON. (No. 8159.)

(Court of Civil Appeals of Texas. Galveston. May 3, 1922.)

**1. Trial ⬅═350(6)—Refusal to submit issue as to whether passenger bought a ticket to place where alleged injury received held error.**

In an action by a passenger for an injury, in which the claim of the passenger was based on the fact that he bought a ticket to a certain place and was injured in alighting there, in which no instructions were given as to what was required to make plaintiff a passenger in a legal sense, refusal of an issue requested by the carrier as to whether plaintiff bought ticket over the carrier's railway to the place where the alleged injury took place was error.

**2. New trial ⬅═52—Upholding quotient verdict held not an abuse of discretion.**

In an action by a passenger for personal injuries, where the jury arrived at a verdict by putting down the amount thought proper by each juror and dividing by 12, in the absence of agreement among them that they were bound by the amount so found, refusal to grant a new trial on account of the method of arriving at the verdict was not an abuse of discretion.

Appeal from District Court, Brazos County; W. C. Davis, Judge.

Action by C. E. Ellison against the Bryan & College Interurban Railway Company. From judgment for plaintiff, defendant appeals. Reversed and remanded.

Henderson & Ranson, of Bryan, for appellant.

PLEASANTS, C. J. This suit was brought by the appellee against the appellant to recover damages for personal injuries alleged to have been caused by the negligence of the appellant.

The plaintiff alleged:

"That on or about October 18, 1918, he was in the city of Bryan and desired to journey on the line of railway of defendant from said city of Bryan to the station of the Gulf Coast Oil Company or Gulf Refining Company, and with said purpose in view plaintiff repaired to the depot of defendant in Bryan, boarded said defendant's train, paying the conductor of said defendant the customary charge and fare for said journey; that he informed defendant's agent of the place of his destination and requested said agent and conductor to stop at said point and allow plaintiff to disembark; that defendant's said agents and servants agreed so to do; that when said train upon which plaintiff was a passenger approached said station of the Gulf Coast Oil Company or the Gulf Refining Company, it gave the usual and customary signal, and upon reaching the station came to a full stop, and that when defendant's agent called out and announced the station, plaintiff made haste to disembark safely and promptly from said train when it came to a full stop as he should be directed so to do by

defendant's agent and conductor; that when said train came in to a full stop defendant's said agent and conductor ordered and directed plaintiff to alight and disembark from said train, and that plaintiff hastened to comply with said order and direction; that it was in the night, and plaintiff was a stranger to the place and surroundings; that there were no lights at said place, no foot rest or stool upon which plaintiff could alight, and defendant's agents and conductor made no offer to assist plaintiff to alight from said train; that as soon as the train came to a stop and plaintiff could in safety stand up in said train and make an effort to alight, he did so, but that the defendant, its agent, etc., wholly disregarded their obligations and promise to stop said train a sufficient time at the station to furnish plaintiff a safe place in which to alight and disembark, negligently stopped said train in a dark, rough, and unsafe place, and willfully, carelessly, and negligently started said train with great suddenness, with a violent jerk, by reason of which plaintiff was thrown with great violence from said train onto the ground, track, and ties of said railroad roadbed and was dragged by said train a distance of 40 yards over the ties, gravel, and rails of said railroad roadbed; that by reason of being jerked and thrown from said train plaintiff's face and head, left shoulder, arms, wrist, etc., were skinned, torn, bruised, lacerated, etc., and he was otherwise seriously and permanently injured. Plaintiff further alleged that he was uneducated and was dependent upon manual labor to support himself and family; that he was a farmer by occupation and was capable of earning $6 per day at said occupation, but by reason of his injury he was wholly disabled for three months from laboring on his farm or performing any labor whatever; that he will never be able to labor with his left hand and wrist again; that his ability to labor and earn money in the future is greatly diminished and impaired and that his injuries are serious and permanent; that he has suffered great physical pain and will continue to suffer great physical pain; that he has suffered mental pain by reason of being unable to labor and support his family; that he will continue to suffer."

Plaintiff sued for a total damage of $3,000.

Defendant answered by general demurrer, special exceptions, and by general and special denial of the material allegations of the petition, and by pleas of contributory negligence.

The trial in the court below resulted in a verdict and judgment in favor of the plaintiff for the sum of $677.50.

Plaintiff testified in substance that he was injured by falling from the defendant's car in the manner and under the circumstances alleged in his petition. He further testified that he was riding in the car as a passenger, having purchased a ticket from the ticket agent at Bryan before entering the car, and gave the ticket to the conductor on the car. His testimony on this issue is as follows:

"I got my ticket for the Gulf Coast Refining Company and asked if he would put me off

there. It was a lady conductor and she had taken up the ticket. I would not be positive, but I think it was about 8 or 8:30 when I got to the station that night. I mean the station here in Bryan. I certainly bought a ticket. I bought it down at the little station. I think I paid five cents for it to ride to the station. I bought the ticket from the agent there.

"Q. What kind of a looking man was he? A. I couldn't tell exactly what kind of looking fellow he was.

"Yes, it was inside the house right at the ticket window. I certainly bought a ticket and paid five cents for it. When I got on the car I got on the front end where he was. I gave the lady my ticket. She was conductor, I suppose. I did not read my ticket, and do not know what the ticket said. When I went to get my ticket I asked for a ticket to the Gulf Refining Company. I could not tell you what kind of ticket it was. I wasn't paying much attention to the ticket. I knew I had a ticket to go down there on. The ticket was a piece of cardboard like a regular railroad ticket, but I wasn't paying so much attention to the ticket. I cannot give any idea as to what kind of ticket it was because I wasn't paying so much attention to the ticket. As to the color of the ticket, that has been two years ago, and a man can't keep things like that on his mind. I have heard these witnesses testify that the custom of the road was that no ticket could be sold from the town of Bryan out to the Gulf Refining Company plant. Yes, I bought a ticket out there. I went to the office and spoke to the agent; there was a lady there that said she was the agent, and I says, 'I want a ticket to go out to the oil station,' and she just gave me a slip of paper as I stated a while ago, and I stuck the ticket in my pocket and paid five cents, the fare out there, and I got on the train. I said I bought the ticket from a lady. I did not say a while ago that I bought it from a man. I bought it from a lady right at the ticket office. As to whether it was Mrs. Penn who testified here I couldn't swear positively what lady it was; I just went to the office and wasn't acquainted with the road or anything about it. No, I did not go on the inside of the depot to buy my ticket. I bought it right there in front. I called for a ticket, and the lady, whoever it was, gave me a ticket. I swear positively as to the lady who gave me the ticket. When I got on the car, I gave the ticket to the lady on there—the conductor, I suppose. She had on a conductor's cap."

No other witness testified to the accident, and no witness was produced who corroborated plaintiff as to his being on the car on the night he was injured; but there is ample evidence to justify the finding that he was injured at the time and place alleged, and the circumstances shown tend to corroborate his statement that his injury was caused by a fall from the car.

The operatives of the car, the conductor and motorman, both testified that they had no recollection of seeing plaintiff on the car on the occasion in question; that the car was not stopped to put any one off at the place plaintiff claimed he got off the car; that this was not a stopping place on defendant's railway; and that no tickets were sold or passengers taken for that place.

The conductor, Miss Carolyne Kern, testified:

"I remember at that time what tickets the Bryan & College Interurban sold. They sold just the book tickets to College. They did not sell tickets to intermediate points. They did not sell five-cent tickets of any character that I know of. On the night of October 26th, I did not take up a ticket anywhere on the line short of College. There was no one at the office at night to sell tickets. I don't think they ever sold any tickets at night. I don't remember seeing this gentleman here on the interurban line. I don't remember his face. I don't remember any accident happening out here on the College road at the point of the curve in October, 1918."

The manager, the vice president, the master mechanic, and the ticket agent of defendant, all testified that there was no stopping place or station on defendant's road at the place plaintiff was injured, and that no tickets were sold by the defendant at that time for any intermediate points on defendant's railway between Bryan and College, and that no single tickets of any kind were sold, but only $5 ticket books. The ticket agent, Mrs. Nettie Penn, testified:

"In October, 1918, I was working for the Bryan & College Interurban as cashier. My duties as cashier was to see after the office, banking the money, keeping tally on the books, and selling book tickets to College for school children. I had charge of the office. In October, 1918, I went to work at 8 and generally closed at 5 in the afternoon. I remember that I was working there in October, 1918. I don't remember this gentleman coming there and complaining about being hurt on the street car the night before. He did not come there with his face bruised up or his arm bruised or any marks on him. He did not come there and make complaint to me. I was the only lady working at the office at this time. I was there in September, October, and November, 1918. The Bryan & College Interurban did not sell at that time tickets to intermediate points between Bryan and College. I did not sell five-cent tickets of any kind. I worked every day during these months except Sundays. I don't suppose there was any one at the office when I did not work. No one was on duty there."

The case was submitted to the jury upon special issues.

[1] The following special issue was requested by the defendant:

"Did the plaintiff, C. E. Ellison, purchase a ticket in Bryan on or about October 26, 1918, for an intermediate point between Bryan and College Station on the line of the Bryan and College Interurban Railway? Answer yes or no."

We think this issue should have been submitted, and appellant's assignments complaining of the refusal of the court to let the jury pass upon the issue should be sustained.

Plaintiff made no claim that he paid any fare other than the ticket which he says he purchased from defendant's ticket agent, and his claim that he was a passenger on the car is predicated solely on the claim that he bought the ticket. In these circumstances, we think the question of whether he did purchase a ticket raises more than a mere evidential fact issue, but was an ultimate issue which defendant had the right to have the jury determine.

If the plaintiff had been a mere trespasser upon the car, those operating it would have been required to use ordinary care not to injure him, in ejecting him from the car, or while he was attempting to alight therefrom; but no such case is made either by the pleadings or the evidence. Plaintiff claimed the right to that high degree of care which a carrier owes to a passenger, and in submitting the issue of whether the operatives of the car were negligent in not stopping it a sufficient length of time to allow plaintiff to disembark in safety, the jury having been first told what was meant by the term "high degree of care," were required to find whether that degree of care was exercised by the operatives to stop the car a sufficient length of time.

The court did ask the jury to find whether or not the plaintiff was a passenger on the car, but gave no instructions as to what was required to make him a passenger in a legal sense so as to entitle him to have the operatives of the car exercise a high degree of care for his safety; the submission of the issue in this way did not justify a refusal to give the charge requested by the defendant. It was entitled to have the issue submitted as it was raised by the evidence, and in such form that the finding of the jury thereon would be free from any ambiguity or doubt as to its meaning.

[2] Appellant further complains of the judgment on the ground that the verdict of the jury was a "quotient verdict" and therefore illegal. The question is presented by the following bill of exceptions:

"Be it remembered that on a trial of the above styled and numbered cause in this court, the following proceedings were had, to wit:

"The jury in this cause, having retired to consider of their verdict, in arriving at their verdict and in assessing the damages that should be awarded to the plaintiff, agreed among themselves that each juror write down the amount he was willing to assess as damages; that the amounts thus written down should be added and the total divided by twelve, and that the result should be their verdict, and that said jurors and each of them did agree to such procedure, and that they individually and as a jury would be bound by the result, and that the said result should be their verdict, and the said agreement was made before the amounts were written down; that said agreement was carried out, and each juror did write down the amount he was willing to assess as damages; the amounts so written down were added, and

the total of said amounts was divided by twelve, and the result was the verdict as to damages of the jury returned into this court; that the defendant being advised of this procedure called the attention of the court to same in his motion for 'a new trial in this cause, and that the court recalled the jury and heard the evidence of the individual jurors in regard to the manner of arriving at their verdict; that eleven of the jurors testified; that two of said jurors testified to the agreement as hereinbefore set out and that same was agreed to by all the jury, and it was understood by them (the two testifying) to be binding upon them as their verdict; that nine of the jurors testified that no such agreement was made; that they did not understand that they were to be bound by the amount ascertained by the various amounts written down and divided by twelve as their verdict; the testimony of all of said jurors being taken down and transcribed and being attached hereto and marked 'Exhibit A' and made a part of this bill of exception. Whereupon the court overruled the contention of the defendant that the verdict of the jury was illegal and refused to grant a new trial, to which action of the court the defendant, in open court, excepted, and here now tenders his bill of exception No. 1, and prays that the same be examined, signed and approved by this court and ordered filed as a part of the record in this cause, this the 4th day of May, A. D. 1921.

"Henderson & Ranson,
"Attorney for Defendant.

"Presented and agreed to by H. S. Moreland and Lamar Bethea, Attorneys for Plaintiff.

"This bill of exception examined, found correct and assigned and approved and ordered filed as a part of the record in this cause, this the 28th day of May, A. D. 1921.
"W. C. Davis, Judge."

The testimony of the eleven jurors, which is a part of the bill, sustains the statements in the bill that two of the jurors understood, when the agreement that each juror should write down the amount he thought the plaintiff should receive and that the sum of these amounts should be divided by twelve was made, that they would be bound by the result and that result should be the verdict. The testimony of these two jurors is as follows:

Frank Griffin testified:

"I was one of the jurors in the case of C. E. Ellison v. Bryan & College Interurban tried here the first of the week. After we retired to consider our verdict, our foreman suggested that each man put down what they wanted to allow the old gentleman and then add it up and divide by twelve. We all agreed to that, and that is what we did. We agreed that would be our verdict. After we had added it up and divided by twelve, one of the jurors suggested that we make it a thousand, and we told him we couldn't do it; that we had agreed on that, and we held him to the agreement.

"Cross-examination: Mr. Buchanan was the foreman. Nobody had expressed himself what he thought he ought to have before this. One fellow wanted to change it and make it a thousand instead of $667.50. $667.50 was

the result after we had divided by twelve. I think it came out even."

W. H. Buchanan, foreman of the jury, testified:

"I was on the jury in the case of C. E. Ellison versus the street railway company.

"Q. State to the court the manner in which you all arrived at this verdict. A. After we had decided in favor of the plaintiff, then the next thing, some of the boys says—possibly I said it—that we would have to get at the amount now, and some one says, 'How can we do it?' and I says, 'Let every fellow just figure what he thinks he ought to have and put it on a piece of paper and add it up and divide it by twelve,' and we did that, and after we had gotten all these figures I suggested again that we make it five hundred, and another one of the boys says, 'Let's make it a thousand.' Several of us were in favor of five hundred and several in favor of making it a thousand, and then I just told them: 'Now, boys, we have divided this among twelve. We agreed to let that go. There's no use to discuss that any more. The judge is waiting for us. Let's get through.' And we decided and let $667.50 be the amount and we all agreed on that.

"It was my understanding when we put that down that that would be the amount, and several of the boys said they understood it that way. That was my understanding and the way I proposed we do it. Of course, we discussed it after we had gotten this amount. We discussed it again, and finally agreed to this amount that we had divided. We did not force anybody to the agreement of $667.50. I says: 'Boys, let's get back here now. We have agreed to add these numbers and divide by twelve. Here is what we've got. Let's get through. We don't want to stay here.' We had not been instructed not to go at it that way, or we could have decided different.

"Cross-examination:

"Q. You say after you all divided it by twelve and found that the result was $667.50, you then had some discussion, and some wanted to make it one amount and some another and finally then you agreed to it, $667.50? A. If we hadn't agreed, we would have had a hung jury. We went back and agreed on that amount, $667.50.

"Q. Independent of this first agreement, Mr. Buchanan, to abide by that decision of setting down—each man setting down an amount and adding it up and dividing by twelve—that was your first agreement; then, after that was done, some one wanted to give a thousand and some five hundred—several boys five hundred. Now, independent of this original plan, that was agreed upon, you twelve men went back and agreed on $667.50? A. Sure, they agreed on it. We first reached an agreement that the plaintiff was entitled to recover. I was sitting at the table as foreman, and when we finished with each one of those things I would put the answer down. We would take a vote at the end of each special issue, and the result of each vote is as returned here, and then we got down to the amount and arrived at that as I have indicated here from the witness stand."

241 S.W.—35

Each of the other nine jurors testified in substance that there was no agreement before or at the time the several amounts were written down, added up, and divided, that the jury be bound by the result, and that this proceeding was had for the purpose of getting a basis of discussion and adjustment of the views of the several jurors on the question of the amount the plaintiff should recover.

In fixing the amount of unliquidated damages a plaintiff is entitled to recover, the verdict of the jury is in most, if not all, cases a matter of compromise or adjustment of the first conclusions of the several jurors. It is improbable, if not impossible, that in a suit of this character each of twelve men would at once reach the same conclusion as to the exact amount of the damage. All that can be expected is that, after considering and discussing the evidence and hearing the conclusions of each juror, the twelve should finally agree upon an amount fair and reasonable as to both the plaintiff and the defendant. In the efforts of the jury to harmonize their respective views on the amount of damages, they cannot be denied the right to ascertain the average amount shown by the method pursued in this case, unless before such amount is ascertained there was an agreement that each juror would be bound to accept such amount as his verdict regardless of whether he thought the amount fair and reasonable. 29 Cyc. 812; 20 Ruling Case Law, § 28; Williams v. State, 15 Lea (Tenn.) 129, 54 Am. Rep. 404; Ry. Co. v. Trippett, 50 Tex. Civ. App. 279, 111 S. W. 761; Ry. Co. v. Lane (Tex. Civ. App.) 127 S. W. 1066.

We do not think such an agreement is so clearly shown in this case as to require us to hold that the trial court abused his discretion in refusing to grant a new trial. It is true two of the jurors say that they considered that they were bound by the agreement to make their verdict in accordance with the result reached by the method before shown, but neither say that they would not have otherwise agreed to the amount found, and defendant does not complain of the verdict as excessive or unreasonable in amount.

In these circumstances, we do not think the assignment complaining of the verdict on the ground stated should be sustained.

The other assignments presented in the brief will not be discussed, for the reason that if any error is shown by any of them it is not such as is likely to occur upon another trial of the case.

For the reason before indicated, the judgment is reversed, and the cause remanded.

Reversed and remanded.